BURROUGHS v. POSTAL TELEGRAPH CABLE CO.

1. TELEGRAPHS AND TELEPHONES—REASONABLE CARE AND DILIGENCE.
   A telegraph company must use reasonable and ordinary care and diligence in its efforts to promptly deliver a message.

2. SAME—REASONABLE CARE.
   Reasonable care is that care which an ordinarily reasonable man would take under the particular circumstances.

3. SAME—REASONABLE CARE—JUSTIFICATION—INSTRUCTIONS.
   Where there was no evidence that the relief telegraph operator was unacquainted with the business or could not do it properly, in an action against a telegraph company for delay in delivery of a code telegram, an instruction, that defendant could not justify because of the fact that such relief agent was not acquainted with the business, and that if it did not put somebody there that was acquainted with the business and could do it properly, defendant could not justify because of it, was erroneous.

4. SAME.

An instruction, that in determining what constitutes reasonable care the jury should consider all the attending circumstances surrounding the transmission and delivery of the telegram from the time of filing at the sending office until delivered, the volume of business received at and sent from the main office at the city of delivery and at the branch office at which the message was delivered to the sendee after transmission from the main office, the method of handling the business, that the message was in code and did not have the street address of the sendee, and that the regular operator at the branch office was sick and the relief operator sent to fill her place on the day of delivery of the telegram was not familiar with the territory and office routine, was proper, without modification.

5. TRIAL—ARGUMENT OF COUNSEL.

In an action against a telegraph corporation it is improper for counsel for plaintiff to state in his argument that it is too often the practice of public service corporations in this country to assume the attitude of the "public be damned" or "darned."

6. TELEGRAPHS AND TELEPHONES—DAMAGES—INSTRUCTIONS.

In an action against a telegraph company for damages for delay in the delivery of a code telegram, an instruction, that where a telegram is in cipher, damages for delay in the transmission and delivery thereof are to be limited to the amount paid for the transmission of the message and interest thereon, was properly refused.

7. SAME.

Where there is a proximate relation in a common-law sense between an injury caused by a failure of duty on the part of a telegraph company in the delivery of a telegram and the injurious results, the sendee is entitled to recover compensation, whether the form of action be on contract, or for breach of duty constituting actionable negligence.

8. APPEAL AND ERROR—QUESTION NOT RAISED ON TRIAL.

A question not raised by an assignment of error will not be considered on appeal.

On loss of profits as element of damages for breach of contract to transmit telegram, see notes in 53 L. R. A. 91, 27 L. R. A. (N. S.) 639, 49 L. R. A. (N. S.) 927.

Error to Genesee; Stevens, J. Submitted October 12, 1917. (Docket No. 96.) Decided December 28, 1917.

Assumpsit in justice's court by J. Ed. Burroughs and others, copartners as J. P. Burroughs & Son, against the Postal Telegraph Cable Company for failure to promptly deliver a message. There was judgment for plaintiffs, and defendant appealed to the circuit court. Judgment for plaintiffs. Defendant brings error. Reversed.

*Roy E. Brownell*, for appellant.

*Lee & Parker*, for appellees.

Stone, J. This is an action of assumpsit for breach of contract, commenced in justice's court, where the plaintiffs recovered a judgment for the amount of their claim. The defendant appealed to the circuit court, where the case was tried with a jury, resulting in a verdict and judgment for the plaintiffs in the sum of $252 damages. The defendant has brought error.

The plaintiffs are partners, conducting a wholesale and retail grain and produce business at Flint, Mich. The defendant and appellant is a corporation duly authorized to conduct a general telegraph and cable business in Michigan, and maintains offices at Detroit and Flint, and other cities in this State. It was the claim of the plaintiffs that its representative, on February 12, 1915, had a telephone communication with the Commercial Milling Company at Detroit in which the plaintiffs proposed to sell to said company a quantity of wheat (four cars of wheat), and the said company replied that it would take any amount up to ten carloads at $1.57 per bushel, if plaintiffs would confirm before the opening of the market at 9:30 a. m.

on February 13th—the next day.   On February 13, 1915, at 9 o'clock a. m., the plaintiffs filed with the defendant, at its Flint office, a telegram signed by plaintiffs and addressed to the Commercial Milling Company at Detroit, Mich.   The telegram was a code message reading as follows:

"2/13/1915.

"To Commercial Milling Co., Detroit, Mich.

(Rush)

"Booking 4 cars more Albino or 2 mixed, dollar congealed.                    [Signed] J. P. B. & S."

This telegram, translated from the code, means:

"Booking 4 cars more number one white wheat or number 2 mixed, $1.57.

[Signed] "J. P. Burroughs & Son."

This message was transmitted by defendant from its Flint office to the main office at Detroit at 9:02 a. m. and received in that office at 9:07 a. m. on the morning of February 13th.   The message was sent by defendant from its main office to its Griswold street branch office at 9:16 a. m., and is marked as received at said branch office at 9:19 a. m.   It was sent out from the branch office at 9:35 a. m. and delivered to the Commercial Milling Company at 9:37 a. m.   The market opened at Detroit at 9:30 a. m. The price of wheat was three cents under $1.57, or $1.54 at opening of the market on that day, or shortly thereafter at the time the telegram was received.   At 10:35 the milling company sent to plaintiffs the following message:

"DETROIT, MICH., Feby. 13, 1915.

"J. P. Burroughs & Son, Flint, Michigan.

"Message book four cars received after opening. Cannot confirm.   Market off three cents.

"COMMERCIAL MILLING CO."

The wheat in question was purchased by the Commercial Milling Company at the close of market on

February 13th, at $1.51, or six cents per bushel less. Plaintiffs' claim at the trial was made for loss of profits on 4,000 bushels of wheat at 6 cents per bushel, caused by the delay of delivery of message.

Upon the trial there was not much conflict in the evidence. The manager of the defendant testified, in substance, that he had prepared a synopsis of the manner in which the time of the operator at the Griswold street office was occupied from 9:07 until 9:20 a. m. on the day in question; that the records show that from 9:07 until 9:14 the operator at the branch office was busy with the usual detail in transmitting messages that had been filed at her branch office to the main office; then, immediately upon her getting through sending her messages up to the main office at 9:14, the main office started to send to the branch office messages that had accumulated in the main office over the various wires; that the main office started to send to the branch office at 9:14 and was working continually with the branch office until 9:20; that there were 30 to 40 operators employed in the main office at Detroit; that according to the Detroit record the message in question was received at 9:07; that the main office held that message before sending it to the Griswold street office until the outgoing business had been received from the branch office; that the Griswold street operator sent three messages to the main office during that time; that it took from 9:07 to 9:14 to send these three messages to the main office; that, as soon as the Griswold street operator finished the outgoing business from her office, then the main office sent to the branch office the accumulated messages, as was the usual custom; that between 9:14 and 9:20 the main office sent to the Griswold street office four messages in six minutes; that the regular branch operator, Mrs. Roach, was taken ill on the morning in question, and Miss Bowering, one of the defendant's best operators, was

sent from the main office to take charge of the branch office; that she was the only person in charge there, answering telephone calls, and doing the general routine work of the office that morning; that the message in question was the first message received in the operating room, after the branch office was through with its business to the main office. The witness further testified:

"I will say here that the message to the Commercial Milling Company at Detroit had no address on it, no street number. Now, if another message had come in at the same time, just as an illustration, with the street number on it, so that the girl who was not familiar with her location could pass it along, the other would have to be looked up in the directory or the telephone book; it would not be possible to put the Commercial Milling Company message in its turn without you held up our entire traffic until they had looked it up. The Commercial Milling Company was getting messages over our wires every day. I don't know the reason in the particular instance why the message was delayed. Exhibit A (the message in question) was sent within eight minutes after the wire was open; I would not call that a delay.

"*Q.* But you will recall this, that a message was sent that was received in your office in Detroit three minutes after the Burroughs Central Milling message was received?

"*A.* Yes.

"*Q.* And that message was sent out first to some branch office?

"*A.* Yes, sir.

"*Q.* So that message was sent out of its order?

"*A.* Yes, sir. A message was sent to the branch office that was received in the main office three minutes after the branch message was received. This message was sent in its regular order, and I would not say that it was given precedence over the Burroughs message. All that I would say, ordinarily, our purpose is transmitting messages in the order that they are filed, but, if the operator working on the branch wire had the Milwaukee message and did not

have the other one in front of her, she would have gone ahead and sent the one she did have. If it come along later, it would have followed it, and it may have come along later, according to the arrangement of the room. I would not say that it was somebody's fault in the main office if the Burroughs message did not go out first. * * *

"The Commercial Milling Company is three blocks distant from the Griswold street branch. It would take the Griswold operator only about two minutes to transcribe the message. It took two minutes for the boy on a bicycle to deliver the message. The messenger boy in the Griswold street office obeyed the instructions of Miss Bowering. It was her duty to look after the business in the branch office and see that the messages were delivered promptly. * * * Miss Bowering, who was in charge of the office on the morning in question, was not familiar with the territory, nor with the people who were in the habit of receiving messages. The girl whose place she took had been in charge of the office for ten years, and Miss Bowering had only been there a couple of weeks off and on. She had worked at this office before and knew about the territory more than any other operator I had at the office at the time. It was the best that we could do. She could not handle the work with the dispatch that our regular operator could. The regular messenger boy was there. It was not necessary, in our judgment, to send another messenger boy over to the Griswold branch. Miss Bowering, however, had been an operator here in Flint. She was well acquainted with the details of office work, and she had been relief operator in Detroit, not only at this branch, but different offices. If any one was sent, I sent her around. She had been our manager at the Pontchartrain Hotel, was able and good; she was as good as I could supply. A person might be a competent operator in the office, and not competent to manage a branch office. Miss Bowering had worked at this office two weeks on one occasion before the day in question. She had been in Detroit 2½ years. * * *

"*Q.* Now, the messages that were being forwarded from the main office to the Griswold street branch office between 9:07 and 9:19 a. m. were messages that

were entitled to precedence by reason of their arrival in the main office, or what?

"*A.* No, there was one message from Milwaukee, received at 9:10 in the operating room, that apparently was sent ahead of the Commercial Milling Company message, received at 9:07. That is such a close margin, however, that we cannot regulate our traffic that close. In a big operating room like the one here in Detroit, the messages that are received come in on different wires in different parts of the room. Sometimes the last one of two messages received around the room will reach the transmitting wire first. In these two messages, however, that were transmitted to the Griswold street branch office, the Commercial Milling Company message was given preference and delivered three minutes ahead of the Milwaukee message, notwithstanding the fact that the boy had to travel further to reach the Commercial Milling Company's office."

This witness further testified that the main office at Detroit handled daily between 8,000 and 10,000 messages; that a great many of those messages were code messages; that the main office in Detroit is a large office filled with tables that are arranged closely together; and on February 13, 1915, there were about 36 or 37 operators in that room, and he described the manner in which the business was done in detail.

Miss Bowering testified, in substance, that on the morning of February 13, 1915, she was sent over to the Griswold street office to take the place of Mrs. Roach, the regular operator at that office, who was ill upon that occasion. She testified:

"There was one messenger boy with me. I reached the branch office at about 8 o'clock. Exhibit A was received at 9:19. I received a message at 9:18 from Milwaukee going to Palmer-Bee Company, and one at 9:19 from New York going to Dean & Shirk Company. At 9:20 a message was received from Brattleboro, Vt., to the Detroit Milling Company. The messenger boy was called at 9:22 by Buhl & Sons; he returned at 9:28. The boy took Exhibit A out for delivery at

9:35, and the message was delivered at 9:37 a. m. I answered the telephone calls that came in that morning, and I waited upon such customers as presented themselves at the Griswold street office. I remember that it was a very busy morning. I had several telephone calls between 9 and 10 o'clock in the forenoon. The messages that were received in the branch office were placed in envelopes, entered them on the boy's book, and got them ready for delivery."

Among other requests by the defendant to charge was the third, as follows:

"In determining what constitutes reasonable care, you are to consider all the attendant circumstances surrounding the transmission and delivery of the said telegram from the time it was filed in the Flint office until it was delivered at Detroit. You are to consider the volume of business received at and sent from the main office, the method and manner in which the business is handled at the main office and the Griswold office; that the message was in code; that the telegram in question did not contain the street address of the Commercial Milling Company; that the regular operator at the Griswold office, Mrs. Roach, was ill and unable to be at the said Griswold office, on the 13th day of February, 1915; and that the relief operator, Miss Bowering, who was sent from the main office on the morning in question, was not thoroughly familiar with the territory in the district of the Griswold office, the tariff rates, and the general routine of the office."

This request was given by the trial court down to the words "Commercial Milling Company," whereupon the court said:

"That is unimportant whether it contained it or not, unless there had been some delay caused by the office in Detroit ascertaining the address; but it seems there was not, so that part of it is immaterial. I have added: 'There has been some testimony that the regular operator at the Griswold office, Mrs. Roach, was ill and unable to be at the Griswold office on the 13th day of February, 1915, and that the relief operator, Miss Bowering, who was sent from the main office

on the morning in question, was not thoroughly familiar with the territory in the district of the Griswold street office, the tariff rates, and the general routine of the office.'

"Now, I charge you that it was the duty of the defendant company to employ competent help who are acquainted with the business of defendant, and if it did not so employ such help, and by reason thereof there was unreasonable delay in delivering the message in question, the defendant cannot justify such delay, by reason of the fact that its operator or agent in Detroit was at the time sick, and that the relief operator was not familiar with the general routine of the office. They cannot justify because of the fact that the relief agent was not acquainted with the business. If they did not put somebody there that was acquainted with the business and could do it properly, that cannot be charged to the plaintiffs, nor can the defendant justify by reason of it because the defendant must do its duty to the plaintiff."

During the argument of the case to the jury, one of plaintiffs' counsel made use of the following language:

"It is too often the practice of public service corporations in this country to assume the attitude of the 'public be damned.' "

Some question arose as to whether the word "damned" was used, or "darned." On objection being made to this language, the court said:

"Gentlemen of the jury, you must pay no attention to it. It is an improper statement and ought not to be made, even with the distinction between 'darned' and 'damned.' "

In its charge to the jury the court called attention to the statute, sections 7205 and 7206, 3 How. Stat. (2d Ed.). They are as follows:

"SECTION 1. *The people of the State of Michigan enact,* That it shall be the duty of all telegraph companies incorporated either within or without this State, doing business within this State to receive dispatches

from and for other telegraph companies' lines, and from and for any individual, and on payment of their usual charges for individuals for transmitting dispatches, as established by the rules and regulations of such telegraph companies, to transmit the same with impartiality and good faith. Such telegraph companies shall be liable for any mistakes, errors or delays in the transmission or delivery, or for the nondelivery of any repeated or nonrepeated message, in damages to the amount which such person or persons may sustain by reasons of mistakes, errors or delays in the transmission or delivery, due to negligence of such company, or for the nondelivery of any such dispatch, due to negligence of such telegraph company or its agents, to be recovered with costs of suit, by the person or persons sustaining such damage.

"SEC. 2. It shall likewise be the duty of every such telegraph company to transmit all such dispatches in the order in which they are received. In case such telegraph company shall refuse or neglect to so transmit such dispatches, such telegraph company shall be liable for all damages sustained by any person or persons whose dispatch is postponed or delayed out of its order as herein prescribed, to be recovered as in the foregoing section: *Provided, however,* That arrangements may be made with the proprietors or publishers of newspapers for the transmission, for the purpose of publication, of intelligence of general and public interest, out of its regular order." 2 Comp. Laws, §§ 5268, 5269 (2 Comp. Laws 1915, §§ 6686, 6687).

Error is assigned upon the language of counsel, already referred to; and in refusing to give defendant's third request, above set forth, as well as others. The court was also requested to instruct the jury, by defendant's ninth request, as follows:

"You are instructed, as in the present case, where a telegram is in cipher, damages for delay in the transmission and delivery thereof are to be limited to the amount paid for the transmission of the message and interest on such amount."

This request was refused.

In the case of *Commercial Milling Co.* v. *Telegraph Co.,* 151 Mich. 425 (115 N. W. 698), this court considered and passed upon the statute above quoted. In that case the message was sent from Detroit, Mich., to Kansas City, Mo. The form of the action there, as here, was in assumpsit. A judgment for plaintiff for damages for negligence occurring beyond the limits of the State was affirmed by a divided court; Justice OSTRANDER writing for affirmance on the ground that the contract to deliver the message was a Michigan contract, that the statute did not interfere with interstate commerce, and did not impair defendant's right of contract. Justice CARPENTER wrote for reversal on the ground that the statute, properly construed, has no application to a contract for service to be performed in part beyond the limits of the State, and that the statute as applied to the contract in question constituted an interference with interstate commerce. The judgment of this court was affirmed by the Supreme Court of the United States. See 218 U. S. 406 (31 Sup. Ct. 59). In his opinion in that case Justice OSTRANDER used the following language which we think states the law correctly:

"In point of time, the statute considered here was passed after this court had, in the absence of a statute, held that regulations similar to the one in question, limiting the liability of a telegraph company for mistakes and delays in transmitting messages and for failures to deliver them, were not unreasonable. The statute is entitled:

" 'An act to prescribe the duties of telegraph companies, incorporated either within or without this state, relative to the transmission of messages, and to provide for the recovery of damages for negligence in the performance of such duties.' Act No. 195, Pub. Acts 1893.

"The duties of telegraph companies with respect to the transmission of messages arise, not alone upon the terms of express contracts which they make, but

also upon the nature of the business carried on and the interest of the public in the manner of conducting the business. They are not common carriers, and they would not, at common law, be liable for mistakes or for delays or failures for which they were not, exercising proper care, responsible. It must be assumed that the legislature, taking into account this rule of law and the one established by this court, and already referred to, attempted to change, not the rule affecting liability for such miscarriages as proper care would have prevented, but the rule that for miscarriages for which they were responsible they might limit liability by contract or by conditions imposed upon senders of messages. If this statute is not considered to have this effect, it seems an entirely useless and ineffectual legislative effort. In reaching this conclusion, neither the reasoning employed nor the authority of the ruling made in *McMillan* v. *Railroad Co.*, 16 Mich. 79 [93 Am. Dec. 208], is questioned. Assuming the intent and the effect of the legislation to be what I have stated it to be, it follows that the word 'negligence,' employed in the statute, does not mean a tort or wrong of defendant distinct from its expressed or implied contract obligations, but it means such a failure to perform its duty as at the common law would render it liable for the consequences. It must be held that the proper construction of the statute and its effect is to forbid a limitation of liability for the consequences of those miscarriages for which at common law such companies are liable, and to this extent to make void the stipulation contained in the contract which reads:

"'It is agreed that the company shall not be liable for mistakes or delays in the transmission or delivery or for nondelivery of any unrepeated message beyond the amount received for sending the same. * * *'"

1. As to the circumstances causing the delay in delivery of message, we are of the opinion that the learned trial judge should have given defendant's third request to charge in full and without qualification. We think that the rule is that a telegraph company must use reasonable and ordinary care and diligence

in its efforts to promptly deliver a message. As we understand it, "reasonable care" is that care which an ordinarily reasonable man would take under the particular circumstances of the case. The case was a close one upon the facts, and the margin of claimed negligence was so narrow that the defendant was entitled to have the rule stated without modification. We think the following language was not justified by the evidence:

"They cannot justify because of the fact that the relief agent was not acquainted with the business. If they did not put somebody there that was acquainted with the business and could do it properly, that cannot be charged to the plaintiffs, nor can the defendant justify by reason of it, because the defendant must do its duty to the plaintiffs."

We do not think that there was any evidence that the relief operator was unacquainted with the business or could not do it properly. The statute (section 7187, 3 How. Stat. [2d Ed.], 2 Comp. Laws 1915, § 8770) authorized the company to make such prudential rules and regulations as might be necessary in the transaction of its business, not inconsistent with the laws of the State or of the United States. In the instant case, the particular circumstances surrounding the transmission and delivery of the message consisted, in part, of the volume of business going through the main office; the method and manner of handling, both at the main, and at the Griswold street office; the fact that the regular operator at the Griswold street office was ill, and unable to be at her place on the day in question; and the fact that the relief operator was not thoroughly familiar with the territory in the district of the Griswold street office, the tariff rates, and the general routine of the office. The whole situation should be considered by the jury, to determine whether the defendant was guilty of negligence.

The defendant was not an insurer. The objection to the language used is that it imposed an absolute duty to receive, transmit, and deliver. As claimed by appellant:

"In substance, it was laid down as a matter of law that a telegraph company must have at all times in its employ persons who are thoroughly familiar with the telegraph business in general, with the territory in the district where the particular office is located, the tariff rates, and the general routine of that office. In short, if that part of the charge is correct, the company can never engage a new employee, either temporarily or permanently, nor can it substitute from another office temporarily, without becoming thereby an insurer against trifling delays occasioned by such changes in the office force."

We are of the opinion that the rule stated to the jury was too stringent and narrow, and was erroneous and prejudicial in its effect. It was the vital question in the case, and probably controlled the jury. We have examined, and call attention to, the following cases which state the correct rule, cited by appellant: *Beasley* v. *Telegraph Co.*, 39 Fed. 181; *Hargrave* v. *Telegraph Co.* (Tex. Civ. App.), 60 S. W. 687; *Western Union Tel. Co.* v. *McDonald*, 42 Tex. Civ. App. 229 (95 S. W. 691); *Western Union Tel. Co.* v. *Neel*, 86 Tex. 368 (25 S. W. 15, 40 Am. St. Rep. 847).

2. As the case must go back for a new trial for reasons already given, it is not necessary to consider the remarks of counsel excepted to, which were improper, and probably will not be repeated upon another trial.

3. We are of the opinion that the court did not err in refusing to charge the jury as requested in appellant's ninth request. We do not agree with counsel in his contention as to the measure of damages. The form of action does not control. Counsel for appellant calls attention to *Fisher* v. *Telegraph Co.*, 119

Wis. 146 (96 N. W. 545). The facts in that case differ radically from the facts in the instant case. We quote from the *Fisher Case,* as stating the correct rule, the following:

"Where there is a proximate relation in a common-law sense between an injury caused by a failure of duty on the part of a telegraph company, in the cases mentioned in the statute, and the injurious results, if there be such, the party damaged is entitled to recover compensation for such results under the statute, whether the form of action be on contract, or for breach of duty constituting actionable negligence."

In this connection, we also call attention to the language of Justice OSTRANDER in *Commercial Milling Co.* v. *Telegraph Co.,* above quoted.

Whether the measure of damages was the price of wheat at the opening of the market on February 13th, or the price of wheat at the close of the market on that day, is a question not raised by any assignment of error, and hence is not discussed.

We find no other reversible error in the case than that above pointed out. The error first above discussed was so vital that we are constrained to reverse the judgment and order a new trial.

The judgment is therefore reversed, with costs to the appellant, and a new trial ordered.

KUHN, C. J., and OSTRANDER, BIRD, MOORE, STEERE, and BROOKE, JJ., concurred with STONE, J. FELLOWS, J., concurred in the result.